**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------- x
COILLE VAN ALPHEN,                 :
                                   :
                Plaintiff,      :     Civil Action No.:
                                     :
       v.                             :
                                     :     **COMPLAINT**
TOCQUEVILLE ASSET MANAGEMENT, L.P., :
JOHN HATHAWAY, ROBERT         :
KLEINSCHMIDT and DOUGLAS GROH, in  :     <u>**Jury Trial Demanded**</u>
their individual and professional capacities,  :
                                     :
              Defendants.    :
------------------------------------------------------------------- x

Plaintiff Coille Van Alphen alleges as follows:

<u>**NATURE OF THE CLAIMS**</u>

1.     The #MeToo movement continues to embolden women to speak out about gender discrimination, even though many powerful, well-financed men still think they can denigrate women with impunity.  This case is another example of a woman showing courage to stand up for herself in the face of sexist men who think they can treat women like second-class citizens.

2.     Tocqueville Asset Management, L.P. ("Tocqueville" or the "Company"), a $12 billion asset management firm, is representative of the lack of gender and other diversity in the financial services profession – out of 57 portfolio managers and analysts, there are only _**two**_ women (or less than 4%) and absolutely _**no**_ African Americans or Hispanics.

3.     Therefore, it is hardly a surprise that one of the two women, Plaintiff Coille Van Alphen – who is a single mother – was directly told that she had "**hit the glass ceiling**," that the Company is a "**boys' club,**" and that she should "move back to Canada" because it must be very difficult for her to be in New York City as a single mom.  After Ms. Van Alphen complained to

Human Resources about this discrimination, she was expressly told by John Hathaway, Tocqueville's Chairman, that she was no longer welcome at Tocqueville.

4.     When Ms. Van Alphen then retained counsel, Tocqueville attempted to back-track, saying she was welcome to stay – but Ms. Van Alphen quickly learned that it was a false invitation, an invitation to remain in a place where she would be further systematically marginalized, isolated and ostracized.  When Ms. Van Alphen complained of this retaliation, the response was a charade of an investigation that involved no input whatsoever from Ms. Van Alphen and, of course, then even further retaliation resulted.

5.     Tocqueville's principal shareholder, President, Chief Executive Officer and Chief Investment Officer, Robert Kleinschmidt, responded to Ms. Van Alphen's retaliation complaint intent on demonstrating to her a complete lack of impartiality and full-on animus towards her, in a transparent attempt to intimidate her into not making protected complaints again.  Mr. Kleinschmidt stated that it was "Not surprising" that the investigation showed she was making "false and baseless allegations," and falsely claimed that it was Ms. Van Alphen who did not believe she could be an effective member of her portfolio group.  Mr. Kleinschmidt told her she had to accept a demotion out of her portfolio group, move to the San Francisco office or be fired.

6.     Ms. Van Alphen objected to Mr. Kleinschmidt's entire response as completely improper in response to a most obviously legitimate discrimination complaint – the prospect of demoting or transferring her had never once before been raised until she raised her complaint of retaliation.  Mr. Kleinschmidt, however, made clear that staying in her current role was not an option, responding to Ms. Van Alphen's request to stay by telling her:

> I am afraid you might be mistaken in how we operate around here at Tocqueville.  I am the principal shareholder, the CIO, the CEO and the President of the firm and you are my employee, an at will employee.  You do not set the agenda for a meeting with me.  Nor

do you choose the attendees.  I am the one with that prerogative.  I am also invested with the authority of telling you, or any other employee, in what department you will be and to whom you will report.  You do not have to accept those conditions, of course, but in that case your employment with the firm will be concluded.

7.      Mr. Kleinschmidt also made clear in his emails with Ms. Alphen that a transfer was necessary "**in order to justify [her] current salary, or some fraction of it**" and that he was giving her an "**opportunity to salvage [her] career, which has been put into jeopardy by [her] own actions**" – namely her making protected complaints of discrimination and retaliation.

8.      Never before in her six years of employment had Ms. Van Alphen been told she was anything other than a valued member of her portfolio group, yet following her complaint of discrimination and then retaliation, she had a career which Mr. Kleinschmidt described as something that needed to be "salvaged" – however, her career would not need to be salvaged if Tocqueville had not so blatantly destroyed it in response to her protected complaints.  Mr. Kleinschmidt also explicitly told Ms. Van Alphen in a meeting about her new position that she had already "maxed out" her pay as an Analyst – thereby again, hitting the "glass ceiling."

9.      Tocqueville proudly models itself on Alexis de Tocqueville's "uncommon perception" of democracy in America, and states it as the basis for using his moniker as the Company's name.  Alexis de Tocqueville, however, also wrote "How the Americans Understand the Equality of the Sexes," wherein he advocated that society can be better carried on by "dividing the duties of man from those of woman" and by "attempting to make one sex equal to the other, both are degraded."  The Company, it seems, picked a nineteenth-century namesake that truly mirrors its own outdated values.

10.      Ms. Van Alphen brings this action against Defendants for monetary, injunctive and declaratory relief under the New York State Human Rights Law, *N.Y. Executive Law §§ 290*

*et seq.* ("NYSHRL"), the New York City Human Rights Law, *New York City Administrative Code §§ 8-101 et seq.* ("NYCHRL"), Equal Pay Act of 1963, 29 U. S. C. §206 *et seq.* ("EPA") and the New York Equal Pay Law, *New York Labor Law § 194* ("EPL").

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over Plaintiff's claims under the EPA pursuant to 28 U.S.C. § 1331 and 1343, because those claims arise under the laws of the United States.  This Court has supplemental subject matter jurisdiction over Plaintiff's related state and local law claims pursuant to 28 U.S.C. § 1367(a), and in the alternative, pursuant to 28 U.S.C. § 1332(a) because of diversity of citizenship.

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## ADMINISTRATIVE PROCEDURES

13.     Ms. Van Alphen will be filing a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and will file an Amended Complaint to include claims under Title VII of the Civil Rights Act of 1964 following receipt of a Notice of Right to Sue.

14.     Following the commencement of this action, a copy of this Complaint will be served both on the New York City Commission on Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of the New York City Administrative Code.

## PARTIES

15.     Plaintiff Coille Van Alphen is a female employee at Tocqueville Asset Management, L.P.  Ms. Van Alphen is a Canadian citizen who works and resides in the United

States.  Ms. Van Alphen is, and at all relevant times, met the definition of "employee" under all applicable statutes.

16.     Defendant Tocqueville Asset Management, L.P. is a foreign limited partnership with a principal place of business located in Vero Beach, Florida.  At all relevant times, Defendant Tocqueville met the definition of "employer" under all relevant statutes.

17.     Defendant John Hathaway is a male resident of the State of Colorado.  Mr. Hathaway is the Chairman of Tocqueville and co-Manager of Tocqueville's "Gold Fund."  As Chair, Mr. Hathaway has the authority to make decisions regarding the terms and conditions of Plaintiff's employment, including, but not limited to, her compensation and whether to terminate her employment.  At all relevant times, Mr. Hathaway met the definition of "employer" under all relevant statutes.

18.     Defendant Robert Kleinschmidt is a male resident of the State of Florida.  Mr. Kleinschmidt is the Chief Executive Officer ("CEO"), Chief Investment Officer, President and principal shareholder of Tocqueville.  As CEO, Mr. Kleinschmidt has the authority to make decisions regarding the terms and conditions of Plaintiff's employment, including, but not limited to, her compensation and whether to terminate her employment.  At all relevant times, Mr. Kleinschmidt met the definition of "employer" under all relevant statutes.

19.     Defendant Douglas Groh is a male resident of the State of New York.  Mr. Groh is a Portfolio Manager at Tocqueville and co-Manager of Tocqueville's "Gold Fund."  As a Portfolio Manager, Mr. Groh has the authority to influence and/or make decisions regarding the terms and conditions of Plaintiff's employment, including, but not limited to, her compensation and whether to terminate her employment.  At all relevant times, Mr. Groh met the definition of "employer" under all relevant statutes.

## FACTUAL ALLEGATIONS

### I.  Background

20.    Tocqueville is a financial services and asset management firm which has been in operation for almost 30 years and has approximately $12 billion in discretionary assets under its management.

21.    Ms. Van Alphen was hired as an Equity Analyst on Tocqueville's Gold strategy investment team (the "Gold Team") which manages a fund of equity investments in the precious metal and mining industries (the "Gold Fund").  Ms. Van Alphen commenced her employment at Tocqueville in October 2011.

22.    To say that Ms. Van Alphen has an impressive professional track record would be an understatement.  Before joining Tocqueville, Ms. Van Alphen worked in Canada for National Bank Financial, Canaccord Genuity and the Canada Pension Plan Investment Board as an investment professional with a focus on commodities.

23.    Ms. Van Alphen has a Master in Business Administration and is also certified as a Chartered Financial Analyst – one of the highest distinctions in the investment management profession.

24.    In 2010, while at a conference at the Denver Gold Forum in Colorado Springs in her capacity as a consultant to the Cardero Group, Ms. Van Alphen met Mr. Hathaway, who was at the conference representing Tocqueville.  Mr. Hathaway and Ms. Van Alphen discussed funding alternatives for a company of which Tocqueville was a major shareholder.

25.    Towards the end of 2010, Mr. Hathaway asked Ms. Van Alphen if she would be interested in joining Tocqueville, and had her come to New York to meet with the team.

26.     After the meeting, Mr. Hathaway offered Ms. Van Alphen a job, which she accepted.  However, Ms. Van Alphen had to wait several months before she could begin employment because Tocqueville made a mistake on her visa application.

27.     In October 2011, Ms. Van Alphen commenced her employment at Tocqueville as am Equity Analyst member of the Gold Team.

28.     Since joining Tocqueville, Ms. Van Alphen has been a valuable member of the Gold Team, which has included researching and selecting numerous investments that have since generated substantial revenues.

29.     Ms. Van Alphen never received any negative performance evaluations about her work until after she raised complaints of discrimination.

30.     Ms. Van Alphen is also a single mother to a young daughter.

31.     As such, Ms. Van Alphen has not only excelled at Tocqueville professionally, but she has done so while also maintaining another highly demanding "full-time job" as a mother.

32.     Ms. Van Alphen is a model to the proposition that women can, in fact, be successful both in the workplace and as family caretakers.

## II.     <u>Discrimination Against Ms. Van Alphen</u>

33.     In or around September 2016, at the Denver Gold Forum, after several years of working at Tocqueville, Ms. Van Alphen approached Mr. Hathaway about the prospect of managing her own junior mining fund.

34.     Ms. Van Alphen explained to Mr. Hathaway that she was confident she could raise $10 million dollars for this junior fund, and already had a soft commitment of $5 million from a large high net worth investor.

35.     Ms. Van Alphen also let Mr. Hathaway know that managing this junior fund would not displace any of her ongoing responsibilities to the Gold Team, and would be in addition to all the other work and coverage she was doing for Tocqueville.

36.     Mr. Hathaway approved Ms. Van Alphen's proposal and agreed to be a co-Portfolio Manager on her junior fund.  As such, Ms. Van Alphen went to work on marketing materials and presentations.

37.     In or around November 2016, Ms. Van Alphen traveled to Vancouver, Canada – a major hub for precious metal investors – and held numerous meetings in her efforts to raise commitments towards this junior fund.

38.     However, despite the significant efforts Ms. Van Alphen had devoted towards this junior fund – with Mr. Hathaway's purported "green light" – Mr. Hathaway abruptly informed her that he was no longer willing to let her move forward with the proposed fund.

39.     Specifically, on December 6, 2016, Mr. Hathaway emailed Ms. Van Alphen while she was in Brazil on a work trip and informed her that while she was a "valued member of the team," the fund would not proceed due to his "conversations with Doug [Groh] and Ryan McIntyre [another Gold Fund Portfolio Manager]."

40.     Ms. Van Alphen was forced to tell her potential investors that the junior fund she had been marketing would not come to fruition.  As a result, a major component of what she expected to be her expanding role at Tocqueville disappeared.

41.     Ms. Van Alphen felt that she was completely undercut by this decision, as she had already devoted substantial efforts with Mr. Hathaway's approval.  As such, Ms. Van Alphen approached Mr. Hathaway and asked that she be made a shareholder at Tocqueville.

42.     Ms. Van Alphen wanted to ensure that she had the same opportunities to advance and develop more independence and responsibility, given that the junior fund opportunity had been taken away from her.

43.     Mr. Hathaway agreed that it was an appropriate request given her industry experience, tenure and performance, but noted that he could not have everyone on the Gold Team as a portfolio manager and asked her to follow up with him about the shareholder request within the next few months because it could not be done immediately.

44.     In December 2016, Ryan McIntyre – who has the same industry experience as Ms. Van Alphen – was promoted to a Portfolio Manager.

45.     As a result, all the three male investment professionals on the Gold Fund – Mr. Hathaway, Mr. Groh and Mr. McIntyre – were Portfolio Managers, while Ms. Alphen was the sole person in an Analyst role.

46.     In late December 2016, the impetus behind Ms. Van Alphen's inability to launch the junior fund was made crystal clear.  Mr. Groh visited Ms. Van Alphen in her office and bluntly told her that she had no future as a woman working at Tocqueville.

47.     Mr. Groh started the conversation by saying "*So, how does it feel to be hitting the glass ceiling?*" in reference to Ms. Van Alphen losing the opportunity to start a junior fund.

48.     Mr. Groh continued:

> **You are clearly not welcome here – this is a boys' club, look around, there are no other women. It must be difficult as a single mom in New York City, why don't you go back to Vancouver?**

49.     Ms. Van Alphen was extremely hurt by these statements and the blatant directive by Mr. Groh to leave Tocqueville because she had no future as a woman and/or as a working mother.  Needless to say, these statements are highly offensive and discriminatory.

50.     Thereafter, Mr. Groh's attitude towards Ms. Van Alphen was increasingly negative, and he became excessively critical to her work.

51.     In February 2017, Mr. Groh and Mr. McIntyre (the male Analyst who had recently been promoted to a Portfolio Manager) organized a reallocation of coverage within the Gold Fund, whereby all large-cap equities were shifted from Ms. Van Alphen to Mr. Groh.

52.     Ms. Van Alphen explained to Mr. Groh that she was not comfortable with the reallocation.  Mr. Groh simply responded, "**You better fall in line before you find yourself in a corner you didn't intend to be in.**"

### III.     Ms. Van Alphen's Complaints of Discrimination and Retaliation

53.     On March 15, 2017, Ms. Van Alphen met with Lucinda Lormier, Tocqueville's Human Resources ("HR") Director, to file a complaint of discrimination.

54.     Ms. Van Alphen complained about Mr. Groh's comments to her that she was "**hitting the glass ceiling**" and that she should "**go back to Vancouver**" because "**it must be difficult being a single mom in NYC,**" in addition to other complaints of discrimination.

55.     Ms. Lormier responded, "**I'm not surprised to hear this about Doug.**"

56.     Following the meeting, Ms. Van Alphen emailed Ms. Lormier to memorialize a summary of their conversation.

57.     Ms. Lormier did not – and has not to this date – taken any action to investigate this complaint or taken any remedial action whatsoever.

58.     Ms. Van Alphen also sent the email complaint directly to Mr. Hathaway (as well as Kelsey Graham in Legal Affairs) and let him know that she had spoken to Ms. Lormier.

59.     Mr. Hathaway, in turn, forwarded the email to Mr. Groh.

60.     Mr. Hathaway – clearly perturbed by having to deal with Ms. Van Alphen's complaint – also left a voicemail for Ms. Van Alphen wherein he told her that he had forwarded the email to Mr. Groh and that she and Mr. Groh better "**work it out.**"

61.     Within days, Mr. Groh and Ms. Van Alphen spoke about the situation, and Mr. Groh admitted, "**I was just stating the facts about this place**," when he said Tocqueville was a "boys' club" and that Ms. Van Alphen had "hit the glass ceiling."

62.     Mr. Groh concluded the conversation by deriding Ms. Van Alpen for involving HR, and he sternly told her: "**In the future, don't involve HR, just come directly to me**."

63.     Only a few weeks later, in May 2017, Ms. Van Alphen followed up with Mr. Hathaway about the timing of her becoming a shareholder, as he had previously asked her to do.

64.     Mr. Hathaway, in response, told her that he was firing her and that she had to start looking for another job.

65.     Mr. Hathaway told Ms. Van Alphen that he would let her stay on for a period of time, but that her career at Tocqueville was over and she needed to separate from the Company.

66.     This conversation was a stark contrast to Ms. Van Alphen's many years of working at Tocqueville without incident, increases in compensation, Mr. Hathaway's initial approval of her junior fund, Mr. Hathaway's recent statement that she was a "valued member of the team" and Mr. Hathaway's previous support in response to her request for a pathway to become a shareholder.

67.     The decision to terminate Ms. Van Alphen – with a date for her separation to be determined – was motivated by her gender and her decision to file a complaint of discrimination.

68.     In the weeks and months that followed, Ms. Van Alphen was continually marginalized as a member of the Gold Team, as she was routinely excluded from portfolio

meetings, email exchanges, discussions regarding new product offerings and strategy conferences.

69.     In effect, Ms. Van Alphen was treated similarly to a junior analyst or intern, rather than someone who had substantial industry experience and was on the brink of managing her own junior fund and/or becoming a shareholder.

70.     Moreover, Mr. Hathaway has, on many occasions, told Ms. Van Alphen, in sum and substance, "**This must be a difficult work environment for you, why don't you just work from home?**"  On many occasions, the direction to "work from home" has been stated more as a demand than a question.

71.     Ms. Van Alphen has repeatedly told Mr. Hathaway that she is not interested in such an arrangement, as she knows it is nothing more than a further attempt to remove her from the workplace.

72.     Towards the end of 2017, Ms. Van Alphen emailed Mr. Hathaway to discuss her bonus, and he immediately cut her off, and replied, "Bonuses have already been decided." Needless to say, Ms. Van Alphen's bonus was not commensurate with the Gold Fund's success – or her contributions – for 2017.

73.     Ms. Van Alphen was paid less than similarly-situated male employees in the Equity Analyst position without any legitimate basis and even though they had substantially the same job position, title and duties on the Gold Team and other funds.

74.     Tocqueville had office space on two floors in its New York City office and recently consolidated all personnel onto one floor.  In late February 2018, a floorplan for the renovated space was distributed throughout the Company.  Ms. Van Alphen was not included in the new floorplan – a further indication that she was being pushed out of Tocqueville.

75.     On or about February 26, 2018, Ms. Van Alphen was attending a conference in Florida which Mr. Hathaway attended as well, and they arranged a time to meet to discuss her future at the Company.

76.     During this discussion, Ms. Van Alphen asked Mr. Hathaway to explain why nothing was done in response to her complaint, why she was told she was being fired after she raised her complaint, despite the fact that she had been doing her job and doing it well, and why Mr. Groh had not been disciplined in any manner.

77.     In response, Mr. Hathaway admitted that Ms. Van Alphen had been a good performer and further admitted that the Company's response to her complaint of discrimination had not been properly handled.

78.     However, Mr. Hathaway refused to do anything to make things right.

79.     Mr. Hathaway simply told Ms. Van Alphen that the situation was "troubling," which is why he thought it would be better for her to work from home.

80.     Mr. Hathaway also made it clear that he was not changing his position that Ms. Van Alphen was being fired and that she was only being allowed to stay at Tocqueville temporarily and that she needed to find another job.

81.     Mr. Hathaway attempted to justify Ms. Van Alphen's termination by proffering "communication issues" as the precipitating issue, rather than retaliation.  However, Mr. Hathaway had no answer for Ms. Van Alphen when she explained that these supposed "communication issues" only arose in connection with her discrimination complaints, and no one had ever raised any issue with her communication before she had complained about Mr. Groh's discriminatory remarks.

82.     In early March 2018, shortly after returning from her trip to Florida and having refused to work from home, Mr. Hathaway sent Ms. Van Alphen a completely unreasonable email attacking Ms. Van Alphen's integrity for failing to follow company policy with respect to approval and expense reimbursements for a business trip to Toronto.

83.     Ms. Van Alphen responded by explaining that she had informed her team in advance of her trip that she would be out of the office, that she did not tell anyone the trip was for business purposes and that she did not attempt to seek reimbursement for any travel-related expenses.  Ms. Van Alphen further explained that she felt continually targeted and discriminated against, and this was only a further example.

84.     Mr. Hathaway responded by claiming that the manner in which Ms. Van Alphen had complained about discrimination and retaliation was further evidence of her supposed "communication issues."

85.     Apparently, at Tocqueville, if a woman complains about gender discrimination or retaliation, the automatically generated response is that the woman is a "complainer" and has "communication problems."

**IV.     Further Retaliation Following Complaints of Retaliation**

86.     It became clear to Ms. Van Alphen that both Mr. Hathaway and Tocqueville as an institution were not interested in legitimately addressing her complaints of discrimination.

87.     Accordingly, on March 16, 2018, Ms. Van Alphen submitted a written complaint of discrimination through her counsel.

88.     On April 9, 2018, Tocqueville responded and proposed that Ms. Van Alphen meet with Robert Kleinschmidt – Tocqueville's CEO – to discuss a potential pathway to become a shareholder and the prospects for launching a junior fund.

89.     On April 17, 2018, Ms. Van Alphen emailed Mr. Kleinschmidt and accepted his offer to meet, and a meeting was scheduled for May 2, 2018 to discuss those topics.

90.     On April 18, 2018, Ms. Van Alphen submitted a complaint to HR in which she again stated that the retaliation against her was ongoing, including that Mr. Hathaway presented at a conference and everyone from the Gold Team, regardless of title, was invited to attend the conference other than her, and that she continued to be excluded from meetings, emails and otherwise from the business of the Gold Team.

91.     On April 19, 2018, Ms. Lormier told Ms. Van Alphen that Mr. Kleinschmidt would respond to her complaint.

92.     On April 24, 2018, Mr. Kleinschmidt responded by saying that, "Not surprisingly, they found in this case, as they found in a previous complaint brought by you, no evidence of any gender based (or any other kind of) discrimination, nor any retaliation against you for making these false and baseless allegations."

93.     Mr. Kleinschmidt's response, in stating that the self-serving findings were "not surprising" and that her complaints were "false and baseless allegations," shows that there was no legitimate, unbiased and impartial investigation into Ms. Van Alphen's complaints.

94.     Moreover, Mr. Kleinschmidt stated that, "It is very clear based on your latest e-mail that you do not believe that you can be an effective member of the Gold Team and that it is necessary to discuss a new and more productive beginning for you at the Firm," and suggested that she could move to the "general research department" and basically start over in her role as an Equity Analyst.

95.      As such, Mr. Kleinschmidt admitted that it was due to Ms. Van Alphen's "latest email" (in which she complained about discrimination and retaliation) that he and/or Tocqueville had determined that she could no longer be a part of the Gold Team.

96.      Mr. Kleinschmidt stated that he would have Peter Shawn, Tocqueville's Director of Research, attend the meeting to address Ms. Van Alphen's transfer out of the Gold Team and that the transfer was necessary to "to justify [her] current salary, **or some fraction of it**."

97.      Ms. Van Alphen had never communicated to Mr. Kleinschmidt or anyone else that she did not believe she could be an effective member of the Gold Team, yet Mr. Kleinschmidt attempted to falsely attribute her agreement to that statement.

98.      Ms. Van Alphen responded by informing Mr. Kleinschmidt that she never said she did not want to be a part of the Gold Team, she had no interest in being transferred to the general research department, which she viewed as a substantial demotion, and she did not want to move to San Francisco.

99.      However, Mr. Kleinschmidt's response made it clear that staying a member of the Gold Team was not an option, and told Ms. Van Alphen:

> I am afraid you might be mistaken in how we operate around here at Tocqueville.  I am the principal shareholder, the CIO, the CEO and the President of the firm and you are my employee, an at will employee.  You do not set the agenda for a meeting with me.  Nor do you choose the attendees.  I am the one with that prerogative.  I am also invested with the authority of telling you, or any other employee, in what department you will be and to whom you will report.  You do not have to accept those conditions, of course, but in that case your employment with the firm will be concluded.

100.     Mr. Kleinschmidt also reiterated the false statement that "The gold team, you, and I all agree that your opportunity to be a successful contributor to that team is finished," threatened to fire her if she did not move to the general research department and mandated her

attendance at the meeting.  Mr. Kleinschmidt also made clear that he considered the transfer as an "opportunity to salvage [Ms. Van Alphen's] career, which has been put into jeopardy by [her] own actions" – namely making protected complaints about discrimination and retaliation.

101.    Ms. Van Alphen had never attempted to change the agenda for the meeting. Rather, it was Mr. Kleinschmidt who made false statements about Ms. Van Alphen's desires and then unilaterally changed the agenda only after Ms. Van Alphen had complained about discrimination and retaliation.

102.    Moreover, the prospect of demoting or transferring Ms. Van Alphen had never once before been raised until she raised her complaint of retaliation.

103.    Faced with Mr. Kleinschmidt's ultimatum, Ms. Van Alphen went to the meeting on May 2, 2018.

104.    At the meeting, Ms. Van Alphen asked why she could not stay on the Gold Team.

105.    In response, Mr. Kleinschmidt told Ms. Van Alphen that he manages the funds and decides where people work, and if she did not like it, she could quit.

106.    Mr. Kleinschmidt also claimed that the Gold Fund is in the process of being sold.

107.    However, this explanation is clearly pretextual as there has been no previous indication that the Gold Fund was being sold, and even if it were true, it does not provide justification for Mr. Kleinschmidt's abrupt decision to remove her from the Gold Team, within days of her retaliation complaint, while at the same time the other members of the Gold Team are not impacted by this purported sale.

108.    Ms. Van Alphen's prospects in the general research department were also not made to look promising as she was explicitly told that she had reached her maximum pay as an

Analyst, and when she asked about her compensation in the role, she received only a vague and meaningless response.

109.     In relation to Ms. Van Alphen starting a junior fund and becoming a shareholder, Mr. Kleinschmidt told her that she could pursue the junior fund, but she would not get Mr. Hathaway's support or any seed money to support the endeavor, and Mr. Kleinschmidt refused to give her any objective means to becoming a shareholder, but rather stated that he decides who he wants to be a shareholder and the decision is subjective.

110.     Given the significant impact and implications on her future at Tocqueville, Ms. Van Alphen asked for some time to think about whether to agree to move to the general research department, or have her employment terminated if she refused.

111.     Following the meeting, Mr. Kleinschmidt emailed Ms. Van Alphen asking to let him know as soon as possible what she decided because he would like to make an announcement about the transfer in the "best light possible."

112.     On May 3, 2018, Ms. Van Alphen informed Mr. Kleinschmidt that she would move to the general research department despite the fact that transfer was a clear demotion and the result of her protected complaints.

## V.      Culture of Discrimination at Tocqueville

113.     The sequence of events that led to Ms. Van Alphen's initial notice of termination and now demotion is easily explained given the complete and utter lack of gender diversity at Tocqueville.

114.     As Mr. Groh stated, Tocqueville is a "**boys' club**," where there is almost no gender diversity whatsoever, and where women are virtually nonexistent, particularly at the higher professional levels.

115.    The natural consequence of this male-dominated environment is acquiescence to disparate treatment of women, and a failure to recognize discrimination even when it is at its most blatant.

116.    In a company without any female leadership, it is no mystery that women who complain are retaliated against and the men who are complained about are protected.

117.    One need look no further than Tocqueville's website to see that the Company does not support the hiring, retention or advancement of women, or even any level of diversity. Tocqueville's "Executive Team" is made up of four white men.  See below:[1]

   

John Hathaway, CFA    Robert W. Kleinschmidt, CFA    Thomas O. Pandick    Robert J. Kramer

118.    Tocqueville as a whole has 38 Portfolio Managers, and only one is female, while the remaining PMs are all white men.  See below:[2]

---

[1]     Available at:  http://tocqueville.com/team/leadership/.
[2]     Available at:  http://tocqueville.com/team/management/.



Robert W.
Kleinschmidt, CFA
Chief Investment
Officer



Ward Anderson



Bruce E. Balding



Anthony P. Balestrieri



Michael Butts



Nicholas Carlozzi



Irvin L. Cherashore



Matthew Cherashore



J.Dennis Delafield



Colin C. Ferenbach



Lawrence M. Fields



Douglas B. Groh


David T. Harris


John Hathaway, CFA


James E. Hunt


Joshua Kaufthal


James R. Keller


Paul J. Kleinschmidt


Kenneth E. Lee


Matthew Loesch, CFA


James Maxwell, CFA


George B. McAuliffe III, CFA


Ryan McIntyre, CFA


Michael T. Meltzer



Rudolf J. Mueller, CFA



Robert Mullin



John Ores, CFA, CPA



Michael J. Paton



Heather J. Perlmutter



Joseph S. Piropato



Vincent Sellecchia



Peter D. Shawn



R. James Thornton



Philip Treick



Thomas R. Vandeventer



Benner Ulrich

   

Donald Wang, CFA       Joseph A. Zock

119.    Tocqueville has 19 Research Analysts –all of whom are white men with the

exception of Ms. Van Alphen.  See below:[3]

         

J. Gordon Forsyth,     Alex George       Joshua Kaufthal      James R. Keller
CFA

         

Paul Lambert, CFA   Matthew Loesch, CFA   James Maxwell, CFA   George B. McAuliffe
III, CFA

---

[3]        Available at:  http://tocqueville.com/team/analysts/.



Ryan McIntyre, CFA



Rodman Moorhead



Tsering Ngudu



John Ores CFA, CPA



Peter Shawn,
Director of Research



N. Douglas Adams



Jean Francois Coste



Michael Ferreira



Peter Ostberg, CFA



Michael Sellecchia



Coille Van Alphen,
CFA

120.    This level of gender (and racial) imbalance simply cannot be explained by any legitimate rationale, and is clearly the byproduct of a company and management that does not value female (or minority) professionals.

121.    Further indicative of an offensive and male-centric culture, at year-end 2018, an investor letter that was nearly distributed by Tocqueville referred to "wet dreams," only to be begrudgingly pulled back when someone had the wherewithal to realize that it was wildly inappropriate.

122.    Mr. Hathaway's management style – spending virtually all his time away from the office in Palm Springs and Vail – only adds to the "boys' club" mentality, as it demonstrates his unwillingness to take any affirmative steps to make any changes to the men-only environment.

### FIRST CAUSE OF ACTION
**(Discrimination in Violation of the NYSHRL)**
***Against All Defendants***

123.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

124.    By the actions described above, among others, Defendants discriminated against Plaintiff on the basis of her gender in violation of the NYSHRL by denying Plaintiff the same terms and conditions of employment available to male employees, including, but not limited to, denying her compensation and other benefits equal to that of male employees, denying Plaintiff the ability to manage her own fund, denying her shareholder status, informing her that she was bring terminated, involuntarily demoting her and otherwise mistreating her relative to male employees.

125.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of the NYSHRL)
*Against All Defendants*

126.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding

paragraphs as if fully set forth herein.

127.    By the actions described above, among others, Defendants retaliated against

Plaintiff on the basis of her protected activities in violation of the NYSHRL by denying Plaintiff

the same terms and conditions of employment available to male employees, including, but not

limited to, denying her compensation and other benefits equal to that of male employees and

involuntarily demoting her.

128.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct,

Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of

monetary damages and other relief.

## THIRD CAUSE OF ACTION
### (Discrimination in Violation of the NYCHRL)
*Against All Defendants*

129.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding

paragraphs as if fully set forth herein.

130.    By the actions described above, among others, Defendants discriminated against

Plaintiff on the basis of her gender and/or pregnancy in violation of the NYCHRL by denying

Plaintiff the same terms and conditions of employment available to male employees, including,

but not limited to, denying her compensation and other benefits equal to that of male employees

and involuntarily demoting her.

131.    As a direct and proximate result of Defendants' unlawful and discriminatory

conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, harm for

which she is entitled to an award of monetary damages and other relief, in addition to costs and reasonable attorney's fees.

132.    Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## FOURTH CAUSE OF ACTION
### (Retaliation in Violation of the NYCHRL)
### *Against All Defendants*

133.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

134.    By the actions described above, among others, Defendants retaliated against Plaintiff on the basis of her protected activities in violation of the NYCHRL by denying Plaintiff the same terms and conditions of employment available to male employees, including, but not limited to, denying her compensation and other benefits equal to that of male employees and involuntarily demoting her.

135.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief, in addition to costs and reasonable attorney's fees.

136.    Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

## FIFTH CAUSE OF ACTION
### (Violations of the Equal Pay Act)
*Against All Defendants*

137.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

138.    During Plaintiff's employment, Defendants required Plaintiff to perform the same or substantially the same job position as other male employees, requiring equal skill, effort and responsibility under similar working conditions, and paid Plaintiff at a rate of pay, including salary and bonus, less than such male employees.

139.    Defendants engaged in patterns, practices and/or policies of employment which discriminated against Plaintiff on the basis of her gender by paying Plaintiff a lesser rate of pay, including salary and bonus, than that paid to male employees performing the same or substantially similar job duties which require equal skill, effort and responsibility, and under the same working conditions.

140.    As a direct and proximate result of the Defendants' unlawful and discriminatory conduct in violation of the EPA, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.  Plaintiff is further entitled to an award of liquidated damages, reasonable costs and attorneys' fees.

## SIXTH CAUSE OF ACTION
### (Violations of New York Equal Pay Law)
*Against All Defendants*

141.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

142.    During Plaintiff's employment, Defendants required Plaintiff to perform the same or substantially the same job position as other male employees, requiring equal skill, effort and

responsibility under similar working conditions, and paid Plaintiff at a rate of pay, including salary and bonus, less than such male employees.

143.     Defendants engaged in patterns, practices and/or policies of employment which discriminated against Plaintiff on the basis of her gender by paying Plaintiff a lesser rate of pay, including salary and bonus, than that paid to male employees performing the same or substantially similar job duties which require equal skill, effort and responsibility, and under the same working conditions.

144.     As a direct and proximate result of the Defendants' unlawful and discriminatory conduct in violation of the EPL, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.  Plaintiff is further entitled to an award of liquidated damages, reasonable costs and attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants for the following relief:

A.     A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, the State of New York and the City of New York;

B.     An injunction and order permanently restraining Defendants and their partners, officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert with them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C.     An order directing Defendants to place Plaintiff in the position she would have occupied but for Defendants' discriminatory and retaliatory treatment and otherwise unlawful conduct (including reinstatement), and to take such affirmative action as is necessary to ensure

that the effects of these unlawful employment practices are eliminated and do not continue to affect Plaintiff's life;

      D.      An award of damages against Defendants, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including, but not limited to, loss of past and future income, wages, compensation, seniority and other benefits of employment;

      E.      An award of damages against Defendants, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for Plaintiff's mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering and emotional distress;

      F.      An award of damages against Defendants, in an amount to be determined at trial, plus prejudgment interest, for any and all other monetary and/or non-monetary losses suffered by Plaintiff, including, but not limited to, loss of income, earned bonus pay, reputational harm and harm to professional reputation;

      G.      An award of punitive damages, and any applicable penalties and/or liquidated damages in an amount to be determined at trial;

      H.      Prejudgment interest on all amounts due;

      I.      An award of costs that Plaintiff has incurred in this action, including, but not limited to, expert witness fees, as well as Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and

      J.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated:  May 9, 2018
            New York, New York                    Respectfully submitted,

                                                **WIGDOR LLP**

By: _____
                                         David E. Gottlieb
                                         Bryan L. Arbeit

                                      85 Fifth Avenue
                                      New York, NY 10003
                                      Telephone: (212) 257-6800
                                      Facsimile: (212) 257-6845
                                      dgottlieb@wigdorlaw.com
                                      barbeit@wigdorlaw.com

                                      *Attorneys for Plaintiff*